## DECLARATION of DEREK DOCKEN

I, Derek Docken, do hereby declare:

## BACKGROUND/EXPERIENCE

1. I am a Task Force Officer (hereinafter "TFO") with the Drug Enforcement Administration (hereinafter "DEA") and have been since November 2021. My current assignment is at the Medford Resident Office. I am also a Detective with the Central Point Police Department (CPPD), and I have been employed with CPPD for more than seven (7) years. Part of my training and experience has included the basic police academy, five (5) years of patrol, and more than one (1) year as a Field Training Officer (FTO). I have more than 1,200 hours of official law enforcement related training recorded with the Oregon Department of Public Safety Standards and Training. During my employment with the Central Point Police Department, I have investigated or assisted with the investigation of cases including the possession, distribution, and manufacture of controlled substances. While working these types of cases, I have consulted and conversed with numerous law enforcement officers from various local, state, and federal agencies on drug cases of many types, including the distribution of methamphetamine, heroin, fentanyl, marijuana, and cocaine. As a result of this and my own experience and training, I am familiar with these controlled substances and the methods employed by traffickers of these narcotics.

## PURPOSE OF THIS DECLARATION

2. This declaration is submitted in support of a complaint *in rem* for forfeiture of the property located at 741 Hazel Street Central Point, Oregon 97502.

PARCEL DESCRIPTION:
The Westerly 42.62 feet, as measured along Hazel Street, of the following described property: Commencing at the quarter section corner common to Sections 2 and 3 in

Township 37 South, Range 2 West of the Willamette Meridian, Jackson County, Oregon; thence North 89° 51' 15" East along the center line of said Section 3 extended, a distance of 3.31 feet to a 1 1/2 inch iron bolt at the intersection of the Northerly line of Hazel Street in the City of Central Point, Oregon, and thence South 54° 51' West along the Northerly line of Hazel Street 240.0 feet to a 3/4 inch galvanized iron pipe for the true point of beginning; thence North 35° 05' 30" West 167.95 feet to the said center line of Section 3; thence North 89° 51' 15" East along said center line of Section 3 a distance of 185.38 feet to a point 107.42 feet West from the point of beginning; thence South 34° 26' East 61.64 feet; thence South 54° 51' West along the Northerly line of said Hazel Street 151.25 feet to the true point of beginning.

ASSESSMENT DESCRIPTION:
- Residence is 969 square feet with two bedrooms and one bathroom.
- The lot size on the report shows that this structure sits on a 6,534 square foot lot.

(hereinafter "**Defendant Real Property**")

3. In this declaration I will demonstrate, based on the evidence I have reviewed, that there is probable cause to believe, and I do believe, that the **Defendant Real Property** was used or intended to be used to facilitate the illegal distribution of controlled substances, in violation of 21 U.S.C. §§ 841, 846, and 856, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7).

4. The facts in this declaration come from my personal observations, my training and experience and information obtained from other agents and officers. This declaration is for the limited purpose of establishing probable cause. Therefore, I have not set forth each fact learned during the investigation, but only those facts and circumstances necessary to establish probable cause.

## PROPERTY SUMMARY REPORT

5. A Property Summary Report obtained by investigators from Main Street Title Group, LLC shows Tracey Re as the current owner of the **Defendant Real Property,** which has a street address of 741 Hazel Street Central Point, OR 97502. Through interviews and records

obtained from the Oregon Department of Human Services, investigators determined that Tracy L. Re passed away in December of 2022.

6. According to CPPD reports, Tracey Re's daughter, Cortney Re, has lived at the residence off and on since at least 2016. Prior to Tracey Re's passing, she was granted a restraining order on April 29, 2022, against her daughter, Cortney Re, and a boyfriend, which prohibited them from going to the **Defendant Real Property**. CPPD records show that after having to enforce the restraining order on at least two occasions, Cortney Re moved back into the residence after Tracey Re's passing in December of 2022.

## SUMMARY OF THE INVESTIGATION

7. Since 2016, the Central Point Police Department (CPPD) responded to over 109 calls that involved the **Defendant Real Property** and Cortney Re (Re). The calls related to incidents that included general crimes, drug related crimes, and drug trafficking, with the most recent incident occurring in October of 2024.

8. I have reviewed numerous reports pertaining to calls for service from January 2016 to the present. The incidents from 2016-2023 involve various calls to law enforcement and other agencies related to ongoing issues with the premises or individuals located at the property. In my training and experience, law enforcement calls such as the calls listed below are representative of a residence that is consistently being used for the facilitation of both drug use and drug trafficking.

9. Some examples of these calls from 2016-2023, which only make up a representation of the total calls for service to the premises, include the following:

- Vandalism;
- Multiple calls by neighbors for drug activity and disorderly conduct;

**Declaration of Derek Docken**                                                                                           Exhibit A Page 3

- Multiple citations issued for possession of heroin and methamphetamine, to Re and others;
- Multiple drug related vehicle stops near the residence;
- Multiple arrests pertaining to outstanding arrest warrants for Re and others;
- Several vehicle thefts; and
- Calls regarding unsafe conditions for the owner of the property, Tracy Re.

**Additional 2024 Incidents**

10. Starting in March 2024, the Drug Enforcement Administration (DEA) partnered with CPPD in investigating drug trafficking that was occurring out of the **Defendant Real Property** by Re and her boyfriend Michael Guidotti (Guidotti). The following are specific examples of additional recent criminal activity within 2024 involving Re and the **Defendant Real Property**, which are representative of a residence that is still currently being used for the facilitation of both drug use and drug trafficking:

- 2/21/2024: CPPD conducted a traffic stop on Daniel Jones (Jones) who was observed leaving the **Defendant Real Property**. CPPD took Jones into custody pursuant to a warrant that had been issued for his arrest. Jones was found to be in possession of and cited for possession of methamphetamine, possession of fentanyl, and possession of a schedule IV-controlled substance.

- 3/18/2024: CPPD conducted a traffic stop on a vehicle that had driven to the **Defendant Real Property** and left only a few minutes later. The driver, Bobby Charlton (Charlton), was arrested on a probation violation detainer after the vehicle was found to be stolen and Charlton was found to be in possession of methamphetamine and fentanyl.

After Charlton's arrest, he was interviewed at the Jackson County Jail. Charlton stated that although he had not purchased the drugs he was arrested with from Courtney Re, she was selling narcotics from the **Defendant Real Property**. Charlton also stated that he had the ability

to purchase fentanyl from Re at any time.

- 3/27/2024: CPPD responded to the **Defendant Real Property** regarding a report of a stolen vehicle in the backyard of the property. CPPD executed a search warrant for the seizure of the stolen vehicle and located the vehicle in the backyard of the **Defendant Real Property**.

- 4/8/2024: CPPD responded to the **Defendant Real Property** regarding a stolen vehicle parked in the driveway of the property. CPPD observed persons in the residence who refused to exit or communicate with officers. The stolen vehicle was seized and towed from the **Defendant Real Property**.

## Surveillance of Defendant Real Property

**Traffic Stop 1 Resulted in Seized Narcotics and Evidence of Drug Distribution:**

11. On April 10, 2024, at approximately 11:21 a.m., I observed a black GMC truck without license plates park in the driveway of the **Defendant Real Property**. I observed a male exit the vehicle, believed to be Justin Nagel (Nagel), and bring a reusable grocery style bag into the residence. Nagel then exited the residence with Guidotti and then went back and forth from the residence to the truck multiple times, until Nagel returned to the vehicle the last time and backed out of the driveway.

12. After leaving the **Defendant Real Property** and committing a traffic violation, CPPD conducted a traffic stop on the vehicle and identified the driver as Nagel. During the traffic stop, Nagel admitted to the use of methamphetamine and having addiction issues with fentanyl.

13. A search of the vehicle was then conducted which resulted in the seizure of over 100 blue M-30 suspected fentanyl pills, multiple plastic bindles containing suspected fentanyl

powder, approximately $400 in U.S. Currency, a digital scale with white powder like residue, a vial believed to contain methamphetamine, and an additional vial believed to contain fentanyl.

14. During the traffic stop, Nagel told officers that Guidotti lived at the **Defendant Real Property**. Nagel also admitted that the blue M-30 pills and the powder seized from his vehicle were fentanyl. Nagel also consented to a download and search of his cell phone. Nagel was subsequently released from the traffic stop.

15. A review of Nagel's cell phone showed there were Facebook Messenger messages between him and Guidotti, which indicated that Nagel had been purchasing and selling drugs back and forth with Guidotti. I know from my training and experience that drug dealers will often sell to each other when the other is currently out of their supply, which appeared to be consistent with the messages found on Nagel's phone between he and Guidotti. The following messages were extracted from Nagel's phone and occurred a few days prior to the traffic stop:



16. Based on my review of Nagel's phone messages, the seized narcotics from Nagel's traffic stop, and my additional training and experience regarding the distribution of narcotics, I believe Nagel's request for "white" appears to be a request for methamphetamine, as "white" is a known commonly to be another name for methamphetamine. It also appears the "50" and "100" referenced in the phone messages between Nagel and Guidotti appears to refer to blue M-30 fentanyl pills, like the 134 M-30 fentanyl pills that were seized from Nagel during the traffic stop on April 10, 2024, after leaving the **Defendant Real Property**.

**Traffic Stop 2 Resulted in Arrest and Evidence of Drug Use:**

17. On April 22, 2024, while conducting live surveillance of the **Defendant Real Property**, I observed a male exit the front passenger door of a white sedan and walk into the residence. Approximately 10 minutes later, I observed the same male exit the residence and get back into the vehicle. CPPD conducted a traffic stop on the vehicle and identified the passenger as Jayson King (King), who was found to have an outstanding warrant for his arrest for a probation violation from the possession of heroin.

18. During the stop, police found foil in the passenger door as well as a glass pipe with burnt residue appearing consistent with fentanyl and was seized. King was lodged on the warrant for his arrest and later admitted to CPPD to smoking the fentanyl.

19. The driver of the vehicle was identified as Jeremiah Johnson (Johnson) and the back passenger was identified as Joshua Morris (Morris), who was found to be on post-prison supervision for delivery of methamphetamine. During the traffic stop, a small plastic bag of a white crystal-like substance from the driver's seat floorboard was seized as suspected methamphetamine. The field test on the suspected methamphetamine came back with an

inconclusive result; Johnson and Morris were released from the scene. Subsequent lab results on the suspected methamphetamine came back negative.

**Stolen Bicycle Was Found in Defendant Real Property Resulting in Theft Citation:**

20.     On April 25, 2024, I was conducting surveillance at the **Defendant Real Property** again, when investigators observed Guidotti leave the residence on foot walking towards the 1200 Cherry Street Apartments. Guidotti was then seen riding a bicycle with a long straight object across his handlebars, consistent with the shape and size of bolt cutters, back to the **Defendant Real Property.** Guidotti then picked the bicycle up, and quickly proceeded toward the front door of the residence carrying the bicycle.

21.     Later the same day, CPPD received a report of a stolen bicycle from a resident of the 1200 Cherry Street Apartments which appeared to be consistent with the same bicycle Guidotti rode back the residence at the **Defendant Real Property**. CPPD responded to the **Defendant Real Property** and contacted Guidotti at the residence regarding the stolen bicycle.

22.     After CPPD detained Guidotti and read him his Miranda rights, Guidotti admitted to stealing the bicycle by cutting a chain off the bicycle. Cortney Re then went inside the residence and retrieved the bicycle and provided it to the officers. When searching Guidotti incident to arrest, CPPD found two "tooters" in his pocket with burnt fentanyl residue. I know from my training and experience that a "tooter" is a straw like object used for the smoking of narcotics such as heroin and fentanyl. Guidotti then admitted to officers to having a fentanyl addiction and he was cited for Theft II.

///

///

///

**Pole Camera Shows Frequent Short-Term Traffic:**

23.     Based on pole camera[1] footage and live surveillance of the **Defendant Real Property**, there is frequent short-term traffic, which based on my training and experience is consistent with drug trafficking. As recent as May 1, 2024, I observed multiple short-term visits by vehicles throughout the day. On May 12, 2024, a neighbor of the **Defendant Real Property** confronted Guidotti and Courtney Re as they were shining a flashlight into his vehicle. The neighbor reported that he had been a victim of thefts on multiple occasions over the last month and he had seen regular traffic coming and going from the **Defendant Real Property.**

24.     Finally, as recent as July 23, 2024, a CPPD officer responded to a domestic dispute at the **Defendant Real Property**, where police observed drugs and drug paraphernalia had been scattered throughout the property. After a short investigation by the officer, Guidotti was ultimately arrested for Assault IV, Harassment, and Felon in Possession of a Restricted Weapon.

<u>**CS Statements of Fentanyl Purchases and Dealers**</u>

25.     In September of 2022, a confidential source (hereinafter "CS") advised investigators that prior to being a CS, the CS had purchased fentanyl from Courtney Re and her prior boyfriend, Michael Roper (Roper), from the **Defendant Real Property** on at least five separate occasions. The CS advised he/she would make contact via the Signal app and was then instructed to park down the road from the **Defendant Real Property**. The fentanyl would then be brought from the **Defendant Real Property** to the CS's vehicle to complete the fentanyl sale.

---

[1] A pole camera is a camera placed on a power pole that provides law enforcement with live or recorded digital surveillance of a piece of real property.

26. The CS was cooperating with law enforcement for consideration on a possible sentence reduction regarding a potential illegal drug distribution charge. The CS was ultimately not charged in the previous case and did not have any previous arrests or criminal history. Shortly after the CS became a confidential source, the CS provided credible information on multiple fentanyl dealers in the Central Point area including Courtney Re and Roper. The CS was also involved in several controlled purchases from other dealers while working with investigators, which resulted in law enforcement obtaining the probable cause needed for charges on multiple additional targets.

### Search Warrant at Defendant Real Property

27. On April 26, 2024, United States Magistrate Judge Mark D. Clarke signed a residential warrant for 741 Hazel Street Central Point. On May 1, 2024, the Medford Resident Office of DEA along with CPPD executed the search warrant at 741 Hazel Street Central Point, Oregon. Upon execution of the search warrant, investigators located paraphernalia related to the use of fentanyl with believed fentanyl residue, along with a digital scale, multiple smart phones, and a .38 caliber round. The residue from the paraphernalia was not lab tested due to the residue being of such small quantities.

### Interviews with Cortney RE and Michael Guidotti

28. At the execution of the search warrant, I and TFO Robert Gilinsky conducted recorded interviews with Cortney Re (Re) and Guidotti. Re and Guidotti were read their Miranda rights and they both advised they understood their rights.

**RE Interview:**

29. Re was confronted about drug trafficking activity at the **Defendant Real Property.** She was asked about the recent traffic to and from the residence, stolen

bicycles/vehicles and various drug seizures from vehicles leaving the **Defendant Real Property**. Re admitted to using fentanyl and said she was trying to get into the methadone clinic because she has a problem with drug use.

30. Re was told that investigators had evidence that drugs were being sold from the **Defendant Real Property**. She claimed that is what "Mikey" (Guidotti) was doing, and then stated she does not know many big drug dealers anymore. Re then admitted that if they (she and Guidotti) do not have any money, they will flip some "sacks" to get some "personal". Re explained that means if someone wants a 50 sack ($50 worth of fentanyl or methamphetamine), Re and Guidotti get the drugs for that person for a better deal, allowing them to flip it to get a point[2] or two for personal use.

31. Re further explained that if she could get a ball[3] of fentanyl for two hundred dollars then they would charge the person two fifty to get an extra fifty bucks. When asked how often they were flipping sacks, Re said it depends, but it could be every other day or every couple of days. Re admitted they would usually have to go somewhere to pick up the drugs and then bring it back to the house (**Defendant Real Property**). Re agreed that was how she was middling deals, which investigators understood to mean Re was using the **Defendant Real Property** to store the fentanyl before reselling at the higher price and then using the extra money to purchase fentanyl for her and Guidotti for personal use.

32. Investigators asked Re if they could look in her phone at her messages and she agreed. Re then advised that both she and Guidotti use the phone, and it is not just her messages in the phone. TFO Gilinsky clarified with Re that there were messages that were definitely her

---

[2] A point is approximately .1 of a gram.
[3] A ball is 1/8th of an ounce.

**Declaration of Derek Docken**                                    Exhibit A Page 11

messaging and she said yes, some parts were her. Re was also asked for consent to download an evidence copy of the phone and she again agreed and provided the passcode for the phone.

33. Re was asked about messages between her and/or Guidotti and Daniel Jones (Jones). Re said normally Jones has the drugs, but lately he has been out and has been getting from Guidotti. Re told investigators that the specific conversation they were asking about was Guidotti messaging Jones with her phone. Re was asked if it was back and forth sales with Jones based on when either one was out. She agreed that was accurate, and then followed it up with saying Jones usually has product and lives nearby with his mother and girlfriend.

**Guidotti Interview:**

34. Guidotti was told investigators have seen traffic to and from the residence (**Defendant Real Property**), stolen vehicles, and the stolen bicycle from the week prior. Guidotti was also told that people had been stopped leaving the residence. Those traffic stops resulted in drugs that were seized, phones seized, and evidence of drugs coming and going from the residence. Investigators also told Guidotti that they have seen evidence of dealing to and from the residence (**Defendant Real Property**).

35. Guidotti was asked if sometimes Daniel Jones (Jones) has a little bit of drugs and sometimes Guidotti has a little bit of drugs, and they help each other out. Guidotti responded to investigators that it was "correct". Guidotti also admitted that the selling of drugs to Jones was to keep Guidotti's habit going and therefore he would flip a sack here and there.

36. Guidotti was then asked to walk investigators through how it works with the vehicles coming and going (to and from the **Defendant Real Property**). Guidotti said he is usually trying to buy for his addiction, but then admitted that when he is flipping a sack and if

Dan (Jones) needs something and Guidotti can get it for cheaper somewhere else, Guidotti would resell it back to Dan (Jones) to make a little money on top to support his habit.

37. Guidotti advised investigators that he is not working and that he has been living at the residence (**Defendant Real Property)** for two years off and on.

38. Guidotti was asked how much he was using right now, and he responded that they try to get a 20 bag (fentanyl) for him daily and a 20 bag for her daily to not get sick. Guidotti then confirmed a 20 bag is about a point and a ball of fentanyl was going for upwards of 300 for clean and even more for ISO. Guidotti also admitted to middling deals.

39. Guidotti admitted that he uses Re's phone. Guidotti said he does not have his own phone but uses Re's phone and her tablet. Although the tablet belonged to Re, Guidotti was asked for consent to a download of the tablet, which he provided. Guidotti then provided the passcode for the tablet and confirmed that no one else lived at the residence (**Defendant Real Property**) other than he and Re.

### Review of Seized Electronic Devices

40. A Cellebrite forensic download of Re's phone was conducted, but investigators were unable to conduct a download of the tablet. Investigators conducted a physical search of both devices however and photographed evidence of Re and/or Guidotti's drug dealing from both devices, as shown in the following paragraphs:

41. The messages below shows Re and/or Guidotti are dealing fentanyl to Daniel Jones (Jones) with Jones indicating he is going over to where Re/Guidotti reside, the **Defendant Real Property**, to pick up the drugs.



42.     In my training and experience messages such as "Cort has a 20 she said she would sell." is a reference to twenty dollars' worth of fentanyl and is consistent with Re's statements of flipping sacks as well as Guidotti's statements of trying to get a 20 bag for each of them every day. In addition, the message stating "a little bit is being dropped off now in like 5 mins" is consistent with Re and Guidotti's statements of acting as a middleman for the sale of fentanyl and is consistent with Re's admission to storing the drugs she plans to resell at the **Defendant Real Property** .

43.     The following messages show Re and/or Guidotti selling fentanyl to "John And Emily":



**Declaration of Derek Docken**                                                    **Exhibit A Page 14**

44. In my training and experience the message containing "dude charges 15 a point I think" is consistent with commonly sold quantities of fentanyl with a "point" being a commonly used term for .1 grams of fentanyl. The message "Alright do you have any w" is consistent with a request for methamphetamine, as methamphetamine is commonly referred to as "white" and shortened to "w". The statement "Picking up more with the fet" is referring to the acquisition of the methamphetamine at the same time as the acquisition of fentanyl, with "fet" being a commonly shortened term used for fentanyl. These messages are also consistent with Re and Guidotti's admissions that they acted as a middleman for the sale of fentanyl and that Re tries to negotiate a lower price so she can support their drug habit.

45. The following message shows the selling of fentanyl by Re and/or Guidotti to "Scott":



46. As shown above, Re/Guidotti message Scott saying "Anyone looking for fet? Got some super fire hit me up". In my training and experience, this message shows Re and Guidotti are looking to sell fentanyl commonly referred to as "fet". In addition, the message "Just got home and wanted to see if you needed anything. my buddy who's with me has some super fire at

**Declaration of Derek Docken**                                                      **Exhibit A Page 15**

the moment" is a reference to offering fentanyl with the fentanyl being referred to as "super fire". The message also indicates Re and/or Guidotti are selling the fentanyl from the residence of 741 Hazel Street (**Defendant Real Property**), as it was referred to as "home" and the date of the message of April 26, 2024, occurred while both Re and Guidotti were living at the **Defendant Real Property**.

47. Finally, the following messages show Re directly attempting to purchase fentanyl from "Steven" and then resale the drugs as a middleman.



48. In the messages above between Re and Steven, "This is Cortney by the way" indicates Re as the operator of the tablet at the time messages are being exchanged. In addition, Re used the term "small sacks" instead of "bag" in the messages, in regard to selling, which was the same term she used during her interview with law enforcement on May 1, 2024. During Guidotti's interview on May 1, 2024, he used the term "bag" instead of "sack", which just further shows that Re is likely the operator of the tablet during the message exchanges above.

49. In my training and experience, the message "what up bro did you ever pick more up I have sales waiting. Trying to get you paid and put a lil bit in pocket if at all possible" shows

**Declaration of Derek Docken**                                             Exhibit A Page 16

Steven is sourcing narcotics for Re and Re is acting as a middleman by lining up sales for when Steven acquires more narcotics.

## CONCLUSION

50.     Based on the evidence in this declaration, there is probable cause to believe, and I do believe that the **Defendant Real Property** was used or intended to be used by both Cortney Re and Michael Guidotti to facilitate the illegal distribution of controlled substances, in violation of 21 U.S.C. §§ 841, 846, and 856, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7).

51.     I have presented this declaration to Assistant United States Attorney Judith Harper who has advised me that in her opinion, the proposed complaint is supported by probable cause.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed this 18th day of October 2024.

s/ *Derek Docken*
Derek Docken
Task Force Officer
Drug Enforcement Administration